955 So.2d 618 (2007)
P.B.P., Appellant,
v.
STATE of Florida, Appellee.
No. 2D03-5368.
District Court of Appeal of Florida, Second District.
April 27, 2007.
*619 James Marion Moorman, Public Defender, and Carol J.Y. Wilson, Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Sonya Roebuck Horbelt, Assistant Attorney General, Tampa, for Appellee.
SILBERMAN, Judge.
P.B.P. appeals a juvenile probation order in which the trial court found that he committed the offenses of battery on a law enforcement officer, obstructing or opposing an officer with violence, and obstructing or opposing an officer without violence. He contends that the trial court erred by denying his motion for judgment of dismissal, arguing that the police officers were not engaged in the lawful performance of their duties at the time of the events giving rise to the charges.[1] We affirm.
*620 A motion for judgment of dismissal in a juvenile case tests the legal sufficiency of the evidence presented by the State. R.J.K. v. State, 928 So.2d 499, 502 (Fla. 2d DCA 2006). In considering such a motion, the evidence and all reasonable inferences that may be drawn from the evidence must be viewed in the light most favorable to the State. Id.; E.A.B. v. State, 851 So.2d 308, 310 (Fla. 2d DCA 2003). The motion should be denied if a rational trier of fact could find that the elements of the offense were proven beyond a reasonable doubt. R.J.K., 928 So.2d at 502; E.A.B., 851 So.2d at 310. If the evidence is insufficient to establish a prima facie case for the charged crime, then dismissal is proper. E.A.B., 851 So.2d at 310. As to whether an officer is engaged in the lawful performance of a legal duty, if the facts and inferences that may be drawn from the facts are in dispute, the issue is for the trier of fact. Williams v. State, 511 So.2d 740, 742 (Fla. 5th DCA 1987). We review the trial court's denial of a motion for judgment of dismissal de novo. E.A.B., 851 So.2d at 310.
The facts developed at the adjudicatory hearing, viewed in the light most favorable to the State, are as follows. At about 3:00 a.m. on May 18, 2003, the Tampa Police Department received an anonymous call complaining about juveniles running through the backyards of homes on Marissa Ridge Place in Tampa. Officers Perrone and Larose responded, and Officer Bruce arrived as backup. All three were in full uniform.
Upon arriving at the scene and exiting the car, Officer Larose thought he heard voices coming from behind one of the houses. Although it is not entirely clear from the record, it appears the noises Officer Larose heard came from behind houses located across the street from the house from which the disturbance call had originated.
In the meantime, Officer Perrone approached the back of the house from which the disturbance call had originated to see if he could determine if juveniles were running through the backyard. Notably, the backyards in the area were open spaces, with no fences. Officer Perrone walked south and stood between a house that was one house south of the address to which the officers had responded and P.B.P.'s house. Thus, P.B.P.'s house was two houses south of the address to which the officers had responded. Officer Bruce arrived and joined Officer Perrone at this location. Both Officers Perrone and Bruce saw that a screen had been removed from a window on the second story of P.B.P.'s house and that the screen was "laying on the side of the window." The house was completely dark inside. Officer Perrone pointed his flashlight and noticed "someone peeping through the window" that was on the northwest corner of the house. The person "quickly tried to hide." He then pointed his flashlight toward the living room/kitchen area of the house, where it was dark, and observed someone hide under the countertop.
Officer Perrone told Officer Bruce to remain in place while Officer Perrone tried to make contact at the front door. Officer Perrone went to the front door of P.B.P.'s house and knocked. After three or four minutes, P.B.P. came to the door. Officer Perrone told P.B.P. what he had observed regarding the screen and people hiding in the house and asked if P.B.P.'s parents *621 were home. P.B.P. said that his mother was in Los Angeles. When Officer Perrone asked if P.B.P. could produce identification to prove that he lived at the house, P.B.P. said he would go and get identification. He then shut the door.
Officer Larose, who was across the street, testified that he observed Officer Perrone speaking with P.B.P.P.B.P. then went inside the house and shut the door as Officer Larose walked across the street to Officer Perrone's location. Officers Perrone and Larose testified that seconds after P.B.P. reentered the house, they heard Officer Bruce giving loud voice commands, and they went to the back of the house.
Officer Bruce, who was still in the grassy area to the rear of P.B.P.'s house, observed P.B.P. go to the rear sliding doors on the west side of the house. Officer Bruce stood about ten to twenty-five feet away. P.B.P. called out and told Officer Bruce "in rather colorful language, to get out of his yard and out of his residence." Officer Bruce approached P.B.P. and identified himself. At that point, P.B.P. was standing just inside the door while Officer Bruce was about three feet away. Officer Bruce asked P.B.P. to "please identify himself." P.B.P. refused and told Officer Bruce to go to the front of the house and that he would then identify himself.
Officer Bruce stated that he asked P.B.P. for identification because he did not know if P.B.P. resided in the house and because he had observed a number of beer bottles in the area. When Officer Bruce again asked P.B.P. for his name and age, P.B.P. refused to give his name but said that he was seventeen years old and that his parents were away. He then reached out and hit Officer Bruce on the left shoulder. Officer Bruce told P.B.P. not to touch him and that "it was battery on a law enforcement officer." P.B.P. then made another motion towards Officer Bruce with his arm, which Officer Bruce blocked.
When Officer Perrone went to the rear area, he saw P.B.P. get "very close to Officer Bruce's face, screaming at him very verbally, that he wasn't getting him shit and told him to get the fuck off his property." When Officer Perrone attempted to take P.B.P. into custody for battery on a law enforcement officer, P.B.P. began punching and kicking at the three officers. P.B.P. broke free and began running, then fell down. He got up and started running again, but the officers were able to arrest him.
At the close of the State's case, P.B.P. argued his motion for judgment of dismissal. The trial court denied the motion, finding that the State had presented a prima facie case and stating as follows:
On the central issue of the lawful performance of duty on this particular evening, indeed, officers had been called by an anonymous complaint at 3:00 in the morning to an area where there was a complaint of juveniles running through the back area and as counsel's just pointed out, the evidence indicates and indeed they were there acting reasonably walking through the area. They came to a home only two doors from apparently the area of the initial complaint according to the evidence of Officer Bruce and I believe Officer Perrone, at which time their suspicions and concerns were aroused further by seeing the screen near a window of a door and what appeared to be as they were flashing their lights around some, at least, momentarily alarming activities at the house and one staring out at them. They didn't act unreasonably, they knocked on the door and were waiting patiently at the front of the door when the evidence indicates that the defendant was exiting the back of the door *622 where he encountered an officer who once again asked for ID. It was at that point that the evidence indicates for the purpose of the State making its case that the defendant struck an officer, an officer he knew to be an officer, who this Court will find at that point for the purposes of this motion, was in the lawful performance of his duty. At that moment he struck that officer in lawful performance of his duty the circumstances completely change because now they indeed began a process of trying to take him into custody. This led to all of the later matters which included the evidence that the State has shown at this point for the purpose of the motion was a resisting with violence and resisting without violence. So the motion will be denied. Those are the findings of the Court.
P.B.P. then testified and disputed the officers' testimony. He acknowledged that when he first spoke to officers at the back sliding glass door, one officer said the police were there because "he believed that there was a burglary." Two neighbors testified that they were awakened by P.B.P. running through their backyard screaming and calling for help as the police officers chased him. They testified that they had not heard any earlier disturbances that night. They described P.B.P.'s demeanor and appearance, including that he looked terrified and that his eyes were very red. The State called Officer Perrone as a rebuttal witness. He testified that on the night in question, P.B.P. appeared to be intoxicated. His speech was slurred, he had bloodshot eyes, he smelled of alcohol, and he was very belligerent in his tone.
At the close of all of the evidence, P.B.P. renewed his prior motions, and the trial court stood by its rulings. In closing argument, P.B.P. asserted that the officers entered his property without consent and without any reasonable basis. He contended that the officers trespassed on his property, that the State did not establish that the officers were engaged in the lawful execution of a legal duty, and that the State did not establish that exigent circumstances existed.
The trial court again concluded that the officers were engaged in the lawful performance of their duties and found that P.B.P. had committed the charged offenses. The court stated its findings as follows:
As has been established beyond a reasonable doubt by the evidence, we're talking about approximately 3:00 in the morning and the report that they received, as the evidence indicated from an anonymous source, was that there were juveniles running through the backyards and so they responded. And in fact they began walking in the yard areas the yard areas in the back as described to the Court without fences back there. They're walking between yards and in fact now they come to a home and they've got their flashlights and they come to the home and their attention is attracted by a screen down on a home near a window. They proceeded at that point with Officer Bruce in the back of the home area with Officer Perrone in the front. Officer Perrone knocked on the door and that's where he encountered for the first time the defendant in this case, who came to the door of what is his home and he was  and the Court will find that the officers had noticed something strange before that because as was testified they had seen someone peering out the window. They had seen someone, apparently through their observation, trying to hide under a counter in the home. All of this taken together with the screen and the report of juveniles *623 in the back as they have described caused them to have a very reasonable suspicion and to be cautious and to go about their lawful performance of duties. And they knocked on the door and someone came there and  and they spoke to them. And it was described that the parent was in Los Angeles but  and then finally it was described that he was in fact seventeen, a juvenile, and the officer asked for identification and the individual closed the door and said he'd go get the identification. Now, comes the encounter in the backyard and this is pivotal to the case. At that time there is another officer in the back. Now the defendant goes to the back. He opens and he encounters Officer Bruce. The Court is going to find and the evidence establishes beyond a reasonable doubt at that point there were some angry words at which time Officer Bruce is essentially asking the same question as the Officer at the front, "Give me some identification, we've got some strange circumstances." And again there is some spirited discussion obviously with [P.B.P.], the defendant, ordering them off his property as they stood near the back door. It's at that point that [P.B.P.] reached out with his right hand and struck the officer in this case, Officer Bruce  make sure we're correct, and struck the officer in his left shoulder. Now, in this point in time the officer had identified himself as he testified, he was in full uniform. He was asking the defendant to identify himself when he refused to do so. In fact, he told the officer at that point if he'd go to the front with the other officers he'd get some ID, but again this spirited conversation and exchange as it's described, but it culminated with [P.B.P.] putting hands on, striking against the will of the law enforcement officer who was in the lawful  engaged in lawful performance of his duty at the time.
The trial court then discussed the officers' efforts to take P.B.P. into custody and ultimately found that P.B.P. had committed the charged offenses. After announcing its detailed findings, the court withheld adjudication and placed P.B.P. on probation.
On appeal, P.B.P. argues that the trial court should have dismissed the charges because the police officers were not engaged in the lawful execution of their duties and, therefore, had no lawful basis to enter his backyard. We disagree.
A reasonable expectation of privacy exists in the backyard of a residence that is not generally viewed by the public, but that expectation gives way in an emergency situation. State v. Duda, 437 So.2d 794, 795 (Fla. 2d DCA 1983). In Duda, the police responded to a radio bulletin concerning a domestic disturbance or a possible fight, and an officer went to the rear of the house because he heard shouting. The court noted that the existence of a potential emergency situation justified the officers' presence in the backyard. Id. at 795-96. The court stated that the "determination of the existence of an emergency is to be measured by the reasonableness of [the officers'] belief at the time, not the existence of an emergency in fact." Id. at 795. In Zeigler v. State, 402 So.2d 365, 371 (Fla.1981), the supreme court stated as follows:
The reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances. The right of police to enter and investigate an emergency, without an accompanying intent either to seize or arrest, is inherent in the very nature of their duties as peace officers and derives from the common law.
*624 In A.E.R. v. State, 464 So.2d 152 (Fla. 2d DCA 1985), the court considered whether, in response to a neighborhood trespassing complaint, police officers could lawfully enter the side yard of a home without a warrant. The officers first went to the front door in response to the complaint. They observed "juveniles jumping up and running toward the back door," which the court stated gave "rise to the inference that the juveniles were eluding the officers and perhaps adding credence to the complaint." Id. at 154. The court acknowledged that there is a "reasonable expectation from unreasonable governmental intrusion" that exists for that part of a backyard that is blocked from view from the front yard or the street. Id. at 153. However, based on exigent circumstances, the court concluded that the officers were justified in entering the side yard. Id. at 154.
In In re J.B., 621 So.2d 489 (Fla. 4th DCA 1993), an officer responded to a disconnected 911 call. Upon arriving at the home from which the call originated, he rang the doorbell. J.B. responded and indicated that he had no knowledge of anyone calling 911 and that he and friends were "messing around." Id. at 490. The officer asked if J.B.'s mother was home, and J.B. said she was not. J.B. "then told the officer to get off of his property." Id. The officer remained concerned because he had observed that a screen was off one of the front windows and that trash was all over the front room of the house. He tried to enter through the screen door, but it was locked. The officer asked J.B. to open the door, but J.B. refused, slammed the door shut, and locked it. The officer ran to the back of the house and saw J.B. pick up a stick. The officer then entered the sliding glass doors, and J.B. approached the officer with the stick. Eventually, J.B. was arrested and charged with resisting arrest and assault on a law enforcement officer. Id.
The court in J.B. rejected J.B.'s claim that the officer was not in the lawful execution of a legal duty because the officer attempted to break into the home when J.B. closed the door. The court noted that the police had the duty and obligation to investigate the 911 call and stated that under the circumstances, it "cannot second guess the officer's concern" that someone might have needed aid or that, given the missing screen and the condition of the living room, a burglary may have just taken place. Id. at 490-91. The court concluded that "[t]he reasonableness of the officer's response to an emergency situation is a question of fact for the trial court which we should not disturb absent a clear error." Id. at 491.
The circumstances here compel a similar conclusion and support the trial court's denial of P.B.P.'s motion to dismiss. At 3:00 a.m., the police officers responded to a disturbance call involving juveniles running through backyards. As the officers tried to determine whether juveniles were in the open backyard area, they saw suspicious circumstances at P.B.P.'s house, including an open window with the screen to the side, someone "peeping through" a window then trying to hide, and someone trying to hide under a counter. At this point, the officers were standing between two homes, and it is unclear whether they had actually entered P.B.P.'s yard.
Officer Perrone went to the front door while Officer Bruce remained in the rear area between P.B.P.'s house and a neighbor's house. Although P.B.P. responded to the front door after a few minutes delay, he then went back into the house and to the rear door, where he called out to Officer Bruce using "colorful language." The officers still did not know P.B.P.'s identity, whether he had been involved in the earlier *625 disturbance, or whether he was trespassing in or burglarizing the house. Officer Bruce approached P.B.P. at the rear only after P.B.P. called out. Neither Officer Bruce nor any of the officers tried to enter the house. Instead, when they tried to ascertain P.B.P.'s identity to determine whether he actually lived in the house, P.B.P. struck Officer Bruce. Under the totality of these circumstances, we conclude that the trial court did not err in determining that the officers were engaged in the lawful performance of their duties and in denying P.B.P.'s motion for judgment of dismissal.
The dissent argues that the officers did not have a legally sufficient basis, such as exigent circumstances, to enter or remain in the backyard areas, including P.B.P.'s backyard. However, as the court observed in Davis v. State, 834 So.2d 322, 327 (Fla. 5th DCA 2003),
[t]here is no catalog of all of the exigencies that may allow a warrantless search of a residence primarily because "[t]he reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances." Nevertheless, precedent provides us the necessary guidance and we derive therefrom that exigencies or emergencies related to the safety of persons or property may support a warrantless entry into a home. Hence, the police may enter a home to investigate a suspected burglary or to check on the safety of its residents, as those circumstances are generally considered exigent circumstances.
(Citations omitted.) The court added that "[a]n entry based on exigent circumstances must be limited in scope to its purpose" and that the police cannot continue a search once they determine that no exigency exists. Id.
The dissent also discusses several cases, the outcomes of which turn on the specific facts and circumstances of those cases. For example, in United States v. McClain, 444 F.3d 556 (6th Cir.2005), the issue involved entry into and a search of a house. The police responded to a phone call from a neighbor who reported seeing a light in a house that had been vacant. An officer saw that lights were on, and he performed a complete inspection of the outside of the house. The officer found no open or unlocked windows, gates, or doors, except he noted that the front door was slightly ajar. The officer entered the house even though there were no signs of forced entry, vandalism, or any kind of illegal activity. Id. at 559-60. In fact, both officers who responded to the call testified that there was no emergency that necessitated their entry into the home and that there were no signs of any criminal activity. Id. at 563.
The court concluded that the police were not justified in entering and searching the home, commenting that something more was required, "namely, the existence outside the searched premises of some physical signs of a burglary or some direct evidence of a home invasion." Id. at 563. In discussing the basis for a warrantless entry into a residence without a warrant, the court stated that probable cause is required, "defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." Id. at 562 (quoting United States v. Ferguson, 8 F.3d 385, 392 (6th Cir.1993)). In this context, "probable cause `requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" Id. at 563 (quoting Illinois v. Gates, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). While mere speculation that a crime could be occurring is not enough, if the police have an "`objectively reasonable basis for their belief' that a crime is being committed," a warrantless search is justified. *626 Id. (quoting United States v. Ukomadu, 236 F.3d 333, 337 (6th Cir.2001)).
United States v. Brown, 449 F.3d 741 (6th Cir.2006), also involved entry into a residence. There, an officer responded to a call from a security service after a residential burglar alarm sounded repeatedly. The officer found that the front door to the residence was locked, but the exterior basement door was ajar approximately twelve inches. There was no car in the driveway, and the officer did not find any broken or pried-open doors. The officer entered the residence because he thought a burglary might be in progress. Id. at 746. However, the officer did not know if the defendant previously had problems with his security system or false alarms. Id. The court stated that under the totality of the circumstances, the officer had probable cause to believe a burglary was in progress, justifying the warrantless entry. Id. at 750. The court noted that "the scope of the intrusion must be circumscribed by the exigencies that justified the warrantless search." Id. at 745.
Here, the totality of the circumstances supports the trial court's determination that the officers were engaged in the lawful performance of their duties and the court's denial of P.B.P.'s motion to dismiss. The officers were in an open backyard area investigating a disturbance call when they observed circumstances that justified their contact with P.B.P. at the front door and then at the rear door. Notably, this case involves a limited entry into P.B.P.'s open backyard area and not an entry into or a search of the residence, a search of any fenced-in area of the property, or a search of P.B.P. The officers' entry was appropriately limited based on the specific circumstances confronting them.
Finally, the dissent suggests that once the officers observed no one running through the backyards, they should have ended their investigation and left. We cannot agree. The officers responded to a disturbance call, and when they observed suspicious circumstances, they investigated using minimally intrusive means that were commensurate with the situation. The question of whether the officers were engaged in the lawful performance of their duties was for the trial court to determine as the trier of fact, based on the evidence. See Williams, 511 So.2d at 742. Because the trial court did not err in finding that the officers were engaged in the lawful performance of their duties and in denying P.B.P.'s motion for judgment of dismissal, we affirm.
Affirmed.
VILLANTI, J., Concurs.
KELLY, J., Concurs in part, dissents in part.
KELLY, Judge, Concurring in part, dissenting in part.
I cannot join the majority in affirming P.B.P.'s conviction for battery on a law enforcement officer because the State failed to prove an essential element of that offensethat Officer Bruce was engaged in the lawful performance of his legal duty when the battery occurred.[2] The trial court applied the wrong legal standard for *627 determining the lawfulness of the officers' actions, and the majority follows suit by approving Officer Bruce's warrantless entry concluding it was "reasonable" but never finding that it was supported by exigent circumstances, the necessary prerequisite to a conclusion that the entry was reasonable under the Fourth Amendment.
In Tillman v. State, 934 So.2d 1263, 1271 (Fla.2006), the supreme court explained that in evaluating the sufficiency of the evidence to reach the jury on the element of "lawful execution," "courts must apply the legal standards governing the duty undertaken by the law enforcement officer at the point that an assault, battery, or act of violent resistance occurs." Because the battery on Officer Bruce occurred during a warrantless entry into the backyard of P.B.P.'s home, the sufficiency of the evidence on the lawful execution element of battery on a law enforcement officer must be evaluated by applying Fourth Amendment law governing warrantless entry by police into a home.[3]See id.
Under the Fourth Amendment, searches and seizures inside a home without a warrant are presumptively unreasonable. Brigham City v. Stuart, ___ U.S. ___, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Because, however, "the ultimate touchstone" of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions. Id. at 1947. The warrant requirement will give way when the "`exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Id. (quoting Mincey v. Arizona, 437 U.S. 385, 393-94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)).
"The circumstances in which the Supreme Court has applied the exigent circumstances exception are `few in number and carefully delineated.'" Riggs v. State, 918 So.2d 274, 279 (Fla.2005) (quoting United States v. U.S. District Court, 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). The Court has held that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, to pursue a fleeing felon, to prevent the destruction of evidence, or "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City, 126 S.Ct. at 1947; see also Riggs, 918 So.2d at 279 (cataloging the circumstances in which the Supreme Court has applied the exigent circumstances exception).
The trial court appears to have concluded that the officers' intrusion was lawful because they were investigating an anonymous complaint regarding juveniles running through backyards in the neighborhood, they performed that investigation reasonably, and while doing so they encountered circumstances that "caused them to have a very reasonable suspicion and to be cautious and to go about their lawful performance of duties." The State apparently recognizes that this reasoning does not justify the officers' warrantless entry,[4] because on appeal the State argues *628 for the first time that the entry was justified by exigent circumstances; specifically, that "the officers had at least reasonable suspicion, if not probable cause, to believe that a burglary was being committed in [P.B.P.'s] residence. . . . Under these circumstances, it was reasonable for an officer to enter and remain in the backyard until [P.B.P.'s] identity could be determined."
Although the Supreme Court has not addressed the issue, federal circuit courts that have considered the question have upheld warrantless searches conducted during burglary investigations under the rubric of exigent circumstances. See United States v. Johnson, 9 F.3d 506, 509 (6th Cir.1993). Those courts have unanimously concluded that an officer may lawfully enter a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress. See United States v. McCullough, 457 F.3d 1150, 1164 (10th Cir.2006). Florida's courts have reached the same conclusion. See, e.g., Zakrzewski v. State, 866 So.2d 688 (Fla.2003); Davis v. State, 834 So.2d 322 (Fla. 5th DCA 2003); State v. Mann, 440 So.2d 406, 408 (Fla. 4th DCA 1983).
The argument that the officers' entry was justified as part of a burglary investigation is flawed in several respects, not the least of which is that it overlooks the fact that the officers' initial entry into a constitutionally protected area had nothing to do with a suspected burglary of P.B.P.'s home. Initially, the officers entered the backyard of a home two houses north of P.B.P.'s home. They did so after being dispatched to that address to investigate a complaint of juveniles running through backyards. The officers did not happen upon the "suspicious circumstances" until after they entered the backyard of that house and began a house-to-house backyard search eventually reaching P.B.P.'s yard. However, the determination of whether a warrantless entry was lawful is based on what the officers knew at the time of entry. See Seibert v. State, 923 So.2d 460 (Fla.2006).
At the time of entry, the officers had no information beyond the fact that someone had called to report juveniles running through backyards. They were not investigating a possible burglary. The majority opinion's citation to A.E.R., Duda, and J.B. suggests that the majority has concluded that the initial entry to investigate this complaint was an emergency that not only required an immediate entry into the backyard of the home where the call originated, but a house-to-house search of the neighbors' backyards as well. The distinction between the facts in this case and the facts in the cases cited by the majority is self-evident.
In A.E.R., the officers were investigating a "neighborhood complaint" that juveniles had been "pool hopping." 464 So.2d at 152. The officers did not arrive and start searching backyards to locate the offending juveniles. They went to the home where the complaint originated and spoke to the complaining party who pointed to A.E.R.'s house as the one where the juveniles lived. It was not until after the officers approached the front of that house *629 and saw the juveniles' apparent attempt to flee out the back door that the officers ran to the back. As they did so, one officer observed a juvenile carrying a marijuana plant that the officers later confiscated.
A.E.R. sought to have the plant suppressed arguing the officer had no right to be in the side yard, and thus the seizure of the plant could not be sustained under the plain view doctrine. Id. This court framed the issue as whether "pursuant to a neighborhood trespassing complaint, officers, without a warrant, may lawfully enter the side yard of appellant's home in an effort to question suspected misdemeanants when the officers believe, after observing the suspects inside the home, that they are eluding the officers." Id. at 153. We first acknowledged the principle that officers investigating a neighborhood complaint may investigate by knocking on an individual's front door, where the individual has no expectation of privacy. This court then concluded that the juveniles' apparent attempt to flee out the back door, which the officers witnessed from the front of the house, created exigent circumstances requiring "immediate action" on the part of the officers. Id. at 154.
In Duda, the officers were responding to a call regarding a domestic disturbance or a possible fight at a residence. 437 So.2d at 794. When they arrived they heard shouting coming from the rear of the home and the backyard. Recognizing that the police have a right to enter and investigate when they reasonably believe they are confronted with an emergency situation, this court specifically found that the officers were faced with a "potential emergency situation" and thus were justified in going immediately to where they believed the disturbance was taking place. Id. at 796.
In In re J.B., the officers were responding to a home that was the source of a 911 call. 621 So.2d at 489. When the call came in, the caller hung up without speaking or requesting assistance. The system dispatched an officer to the home to investigate the call. In finding that the officers acted lawfully in trying to enter the home, the court analogized a 911 call to "screams for help." Id. at 491. The court also discussed the fact that the 911 system is used to report crimes and injuries requiring immediate assistance and that "a disconnect" could happen for "a myriad" of reasons and did not mean the emergency was over. Given that a 911 call is "a cry to the authorities for help," the court concluded that an investigating officer has a duty to investigate until he is satisfied no emergency exists. Id.
Although the cases cited by the majority are clearly distinguishable, even assuming arguendo that the officers' initial entry to investigate the disturbance was justified, the officers were not entitled to remain behind the homes once they determined that no one was back there because any search conducted under the auspices of exigent circumstances must be "strictly circumscribed by the exigencies which justify its initiation." Mincey, 437 U.S. at 393, 98 S.Ct. 2408 (quoting Terry v. Ohio, 392 U.S. 1, 25-26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); see also Riggs v. State, 918 So.2d 274, 279 (Fla.2005) (explaining that when a warrantless search is based on exigent circumstances, an officer must cease the search once he determines that no emergency exists). In other words, once the officers realized that no one was running through backyards, they no longer had a reason to remain behind the houses, much less conduct a yard-to-yard search.
The reasonableness of this course of conductleaving after determining that no one was behind the homesis evidenced by the actions of Officer Larose. Officer Larose testified that he first went into the *630 backyard of a home across the street from P.B.P.'s home because he thought he heard voices coming from that area. Using his flashlight, he was able to see several backyards from his initial vantage point. Seeing no one behind those houses, he walked back out to the street. In contrast, neither Officer Perrone nor Officer Bruce offered any justification for their decision to remain behind the homes on P.B.P.'s side of the street although, like Officer Larose, they saw no one behind the homes. Thus, even if they were justified in going immediately into the backyard of the home where the complaint originated, their continued presence behind the homes was unauthorized, and the "suspicious circumstances" they observed as they approached or entered P.B.P.'s yard cannot provide an after-the-fact justification for their actions up to that point. See, e.g., Olivera v. State, 315 So.2d 487 (Fla. 2d DCA 1975) (explaining that observations made by an officer from a location where he had no right to be are tainted and cannot be used to support the State's position that the officer had probable cause to search or arrest); cf. Davis, 834 So.2d at 327 (explaining that any search conducted after the exigency no longer exists is illegal and any contraband observed pursuant to the illegal search is inadmissible).
Even taking the "suspicious circumstances" into account, to justify a warrantless entry based on the belief that a burglary is in progress, the police must have probable cause to believe that a burglary is occurring, not simply a mere suspicion. See, e.g., McCullough, 457 F.3d at 1164; United States v. Brown, 449 F.3d 741, 748 (6th Cir.2006); United States v. McClain, 444 F.3d 556 (6th Cir.2005); United States v. Johnson, 9 F.3d at 509; Guin v. City of Riviera Beach, 388 So.2d 604, 606 (Fla. 4th DCA 1980). In this context,
[p]robable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion. Under this "flexible, common-sense standard," the establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. However, the "mere possibility" that a crime could be occurring within a home is not sufficient to justify a warrantless search; the police must have an objectively reasonable basis for their belief that a crime is being committed. Likewise, mere speculation that a crime could be occurring is insufficient to establish probable cause.
McClain, 444 F.3d at 562-63 (citations and some internal quotation marks omitted). The trial court made no determination that the officers had probable cause to believe that a burglary was in progress. While the majority alludes to the possibility of a burglary, it stops short of saying that the officers had probable cause to believe a burglary was in progress.
Nor would the record support that conclusion. The record shows that the officers were not responding to a reported burglary and that no alarm had been reported. They did not see any signs of forced entry such as a broken window or a door with pry marksonly a screen propped up next to a second floor window. They did not see any open doors, and when they knocked on the front door, the occupant answered the door and agreed to produce identification. While the trial court notes that the officers saw someone peering out a rear window and that someone tried to hide when the officers shined a light in through a rear window of the home, this hardly seems unusual considering it was three o'clock in the morning and the occupants had no idea the police were roaming through their backyard, nor any indication that police flashlights were the source of the light being shone into the *631 house. In light of all these circumstances, I cannot conclude that the officers had anything more than a mere suspicion that a crime could be occurring. Compare McCullough, 457 F.3d at 1164 (noting that the security alarm at the residence had been triggered, the people at the residence were dirty, did not have any identification, were admittedly not the homeowners, did not know the name of the homeowners, were acting in a nervous manner, and one of them, who was observed leaving the residence, did not attempt to speak to the officer and appeared disoriented); Brown, 449 F.3d at 746 (noting that the officer had responded to a burglar alarm that had been triggered twice in a short period of time, he had gotten no response from inside the house, there was no car in the driveway, and the front door was secure but the back door, which had triggered the alarm, was ajar); Johnson, 9 F.3d at 507 (noting that the officers were responding to a call from a neighbor reporting a burglary in progress, that the neighbor reported seeing individuals crawl through a broken window in the home, that the door to the home was locked but a woman and a man were in the house, the man and the woman claimed to live there but could not open the door because they did not have a key, and they had no identification).
Moreover, even if the officers' observations justified having Officer Bruce remain behind the houses to watch the back door while Officer Perrone went to P.B.P.'s front door, they certainly did not justify the actions Officer Bruce took when P.B.P. appeared at the back door. Officer Bruce testified that when P.B.P. opened the rear sliding glass door and saw him, P.B.P. told him to leave the property. Rather than simply maintaining his position, which the majority suggests may have been outside P.B.P.'s yard, Officer Bruce testified that he entered the yard, walked across the patio area and "went up to him, approached him, was at a bladed stance, he was standing inside of the door, sliding glass doors." Officer Bruce repeatedly asked P.B.P. for identification, but P.B.P. refused to provide it at the back door. Instead, he told Officer Bruce to leave and meet him at the front door where the other officer was awaiting his return. When Officer Bruce refused to leave, P.B.P. pushed him.
Officer Bruce acknowledged that when he entered P.B.P.'s property and came into contact with P.B.P., he did not have permission to be on the property and he had not seen anything illegal occurring on the property. Although he did not explain why he had stayed behind when Officer Perrone went to the front door, he presumably did so to ensure that no one left through the back door of P.B.P.'s home. To accomplish this task, Officer Bruce did not need to come onto P.B.P.'s patio and stand three feet away from him. He could have remained where he had been standing when he first joined Officer Perrone behind the house. This would have placed him outside of P.B.P.'s backyard but still close enough to observe the back of the house. Because Officer Bruce entered a constitutionally protected area without a warrant and without exigent circumstances his entry was not "reasonable" under the Fourth Amendment. When the battery occurred he was not engaged in the "lawful performance" of his duties because his entry violated the Fourth Amendment. Accordingly, P.B.P. was entitled to a judgment of dismissal on the charge of battery on a law enforcement officer.
The charges of obstructing or opposing an officer with violence and without violence stem from what happened next, and as was the case with the battery, we must determine the lawfulness of the officers' actions when these offenses occurred. See Tillman, 934 So.2d at 1273. Officer Perrone, *632 who had been waiting at the front door and had been joined by Officer Larose, heard shouting and Officer Bruce loudly yelling commands. Officer Bruce testified that he used a "command voice" to tell P.B.P. not to touch him and that it was battery on a law enforcement officer. When Officer Perrone went to the back of the house he saw P.B.P. "very close to Officer Bruce's face, screaming at him verbally, that he wasn't getting him shit and told him to get the fuck off his property." Officer Perrone did not see P.B.P. strike Officer Bruce, nor did he see P.B.P. "do anything illegal" up to the point that Officer Perrone approached P.B.P., "put hands on him" and "put him in an escort position" to "pull him out of the house." At that point P.B.P. began to kick, throw punches, and push until he "broke loose" and ran away, ignoring commands to stop.
When Officer Perrone heard Officer Bruce shouting, P.B.P. had gone into the house and closed the door. Thus, Officer Perrone had no way to know where P.B.P. was at that moment. That uncertainty paired with hearing Officer Bruce loudly commanding someone not to touch him and stating that it was battery on a law enforcement officer was enough to make it reasonable for Officer Perrone to enter the backyard to ascertain whether Officer Bruce was in need of his assistance. See Brigham City, 126 S.Ct. at 1947 ("Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). At this point, Officer Perrone was acting lawfully when he entered the backyard to investigate.
Thus, the question becomes whether Officer Perrone was acting lawfully when he grabbed P.B.P. and pulled him out of the house. Section 901.151(2), Florida Statutes (2004), which governs detentions, provides:
Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, the officer may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person's presence abroad which led the officer to believe that the person had committed, was committing, or was about to commit a criminal offense.
This statute is consistent with the holding in Terry, 392 U.S. at 21, 88 S.Ct. 1868," which requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Given what he had heard and witnessed, it was reasonable for Officer Perrone to conclude that P.B.P. had, or was about to commit a felony, battery on a law enforcement officer. Accordingly, he was acting lawfully when he detained P.B.P. Because it was this lawful action by Officer Perrone that precipitated the events leading to the charges of obstructing or opposing an officer with and without violence, I concur with the majority that P.B.P. was not entitled to a judgment of dismissal on those charges.
NOTES
[1] The statutes under which P.B.P. was charged use slightly different terms. Section 784.07(2), Florida Statutes (2003), refers to the "lawful performance of his or her duties." Sections 843.01 and 843.02, Florida Statutes (2003), refer to the "lawful execution of any legal duty."
[2] P.B.P. has argued that he was entitled to a judgment of dismissal as to each offense with which he was charged because the State failed to prove that the officers were engaged "in the lawful performance" of their duties, or "in the lawful execution of any legal duty" at the time the offenses occurred. See §§ 784.07, 843.01, 843.02, Fla. Stat. (2003). The supreme court has stated that although worded in a somewhat different way, these elements are "functionally identical." Tillman v. State, 934 So.2d 1263, 1266 n. 2 (Fla.2006).
[3] As the majority correctly acknowledges, the zone of protection under the Fourth Amendment extends to the curtilage of a home, including the backyard. See State v. Rickard, 420 So.2d 303, 306 (Fla.1982) (noting that courts will not allow a warrantless search or seizure in a constitutionally protected area such as one's backyard); Glass v. State, 736 So.2d 788 (Fla. 2d DCA 1999) (stating that officers were not justified in entering a backyard of a residence without consent, a warrant, or exigent circumstances).
[4] In fairness to the trial court, the State offered no justification for the officers' entry when this issue was argued in the trial court. In fairness to the State, it probably concluded justification was not an important issue because at that time the law in this district was such that the lawfulness of the officers' actions was immaterial except with respect to the charge of opposing an officer without violence. See Tillman, 934 So.2d at 1263 (rejecting the view held by this court and others that section 776.051(1), Florida Statutes (2003), which prohibits the use of force to resist an arrest notwithstanding the illegality of the officer's actions, extends to other police-citizen encounters).