SILBERMAN, Judge.
P.B.P. appeals a juvenile probation order in which the trial court found that he committed the offenses of battery on a law enforcement officer, obstructing or opposing an officer with violence, and obstructing or opposing an officer without violence. He contends that the trial court erred by denying his motion for judgment of dismissal, arguing that the police officers were not engaged in the lawful performance of their duties at the time of the events giving rise to the charges.[1] We affirm.
*620 A motion for judgment of dismissal in a juvenile case tests the legal sufficiency of the evidence presented by the State. R.J.K. v. State, 928 So.2d 499, 502 (Fla. 2d DCA 2006). In considering such a motion, the evidence and all reasonable inferences that may be drawn from the evidence must be viewed in the light most favorable to the State. Id.; E.A.B. v. State, 851 So.2d 308, 310 (Fla. 2d DCA 2003). The motion should be denied if a rational trier of fact could find that the elements of the offense were proven beyond a reasonable doubt. R.J.K., 928 So.2d at 502; E.A.B., 851 So.2d at 310. If the evidence is insufficient to establish a prima facie case for the charged crime, then dismissal is proper. E.A.B., 851 So.2d at 310. As to whether an officer is engaged in the lawful performance of a legal duty, if the facts and inferences that may be drawn from the facts are in dispute, the issue is for the trier of fact. Williams v. State, 511 So.2d 740, 742 (Fla. 5th DCA 1987). We review the trial court’s denial of a motion for judgment of dismissal de novo. E.A.B., 851 So.2d at 310.
The facts developed at the adjudicatory hearing, viewed in the light most favorable to the State, are as follows. At about 3:00 a.m. on May 18, 2003, the Tampa Police Department received an anonymous call complaining about juveniles running through the backyards of homes on Marissa Ridge Place in Tampa. Officers Per-rone and Larose responded, and Officer Bruce arrived as backup. All three were in full uniform.
Upon arriving at the scene and exiting the car, Officer Larose thought he heard voices coming from behind one of the houses. Although it is not entirely clear from the record, it appears the noises Officer Larose heard came from behind houses located across the street from the house from which the disturbance call had originated.
In the meantime, Officer Perrone approached the back of the house from which the disturbance call had originated to see if he could determine if juveniles were running through the backyard. Notably, the backyards in the area were open spaces, with no fences. Officer Perrone walked south and stood between a house that was one house south of the address to which the officers had responded and P.B.P.’s house. Thus, P.B.P.’s house was two houses south of the address to which the officers had responded. Officer Bruce arrived and joined Officer Perrone at this location. Both Officers Perrone and Bruce saw that a screen had been removed from a window on the second story of P.B.P.’s house and that the screen was “laying on the side of the window.” The house was completely dark inside. Officer Perrone pointed his flashlight and noticed “someone peeping through the window” that was on the northwest corner of the house. The person “quickly tried to hide.” He then pointed his flashlight toward the living room/kitchen area of the house, where it was dark, and observed someone hide under the countertop.
Officer Perrone told Officer Bruce to remain in place while Officer Perrone tried to make contact at the front door. Officer Perrone went to the front door of P.B.P.’s house and knocked. After three or four minutes, P.B.P. came to the door. Officer Perrone told P.B.P. what he had observed regarding the screen and people hiding in the house and asked if P.B.P.’s parents *621 were home. P.B.P. said that his mother was in Los Angeles. When Officer Per-rone asked if P.B.P. could produce identification to prove that he lived at the house, P.B.P. said he would go and get identification. He then shut the door.
Officer Larose, who was across the street, testified that he observed Officer Perrone speaking with P.B.P. P.B.P. then went inside the house and shut the door as Officer Larose walked across the street to Officer Perrone’s location. Officers Per-rone and Larose testified that seconds after P.B.P. reentered the house, they heard Officer Bruce giving loud voice commands, and they went to the back of the house.
Officer Bruce, who was still in the grassy area to the rear of P.B.P.’s house, observed P.B.P. go to the rear sliding doors on the west side of the house. Officer Bruce stood about ten to twenty-five feet away. P.B.P. called out and told Officer Bruce “in rather colorful language, to get out of his yard and out of his residence.” Officer Bruce approached P.B.P. and identified himself. At that point, P.B.P. was standing just inside the door while Officer Bruce was about three feet away. Officer Bruce asked P.B.P. to “please identify himself.” P.B.P. refused and told Officer Bruce to go to the front of the house and that he would then identify himself.
Officer Bruce stated that he asked P.B.P. for identification because he did not know if P.B.P. resided in the house and because he had observed a number of beer bottles in the area. When Officer Bruce again asked P.B.P. for his name and age, P.B.P. refused to give his name but said that he was seventeen years old and that his parents were away. He then reached out and hit Officer Bruce on the left shoulder. Officer Bruce told P.B.P. not to touch him and that “it was battery on a law enforcement officer.” P.B.P. then made another motion towards Officer Bruce with his arm, which Officer Bruce blocked.
When Officer Perrone went to the rear area, he saw P.B.P. get “very close to Officer Bruce’s face, screaming at him very verbally, that he wasn’t getting him shit and told him to get the fuck off his property.” When Officer Perrone attempted to take P.B.P. into custody for battery on a law enforcement officer, P.B.P. began punching and kicking at the three officers. P.B.P. broke free and began running, then fell down. He got up and started running again, but the officers were able to arrest him.
At the close of the State’s case, P.B.P. argued his motion for judgment of dismissal. The trial court denied the motion, finding that the State had presented a prima facie case and stating as follows:
On the central issue of the lawful performance of duty on this particular evening, indeed, officers had been called by an anonymous complaint at 3:00 in the morning to an area where there was a complaint of juveniles running through the back area and as counsel’s just pointed out, the evidence indicates and indeed they were there acting reasonably walking through the area. They came to a home only two doors from apparently the area of the initial complaint according to the evidence of Officer Bruce and I believe Officer Perrone, at which time their suspicions and concerns were aroused further by seeing the screen near a window of a door and what appeared to be as they were flashing their lights around some, at least, momentarily alarming activities at the house and one staring out at them. They didn’t act unreasonably, they knocked on the door and were waiting patiently at the front of the door when the evidence indicates that the defendant was exiting the back of the door *622 where he encountered an officer who once again asked for ID. It was at that point that the evidence indicates for the purpose of the State making its ease that the defendant struck an officer, an officer he knew to be an officer, who this Court will find at that point for the purposes of this motion, was in the lawful performance of his duty. At that moment he struck that officer in lawful performance of his duty the circumstances completely change because now they indeed began a process of trying to take him into custody. This led to all of the later matters which included the evidence that the State has shown at this point for the purpose of the motion was a resisting with violence and resisting without violence. So the motion will be denied. Those are the findings of the Court.
P.B.P. then testified and disputed the officers’ testimony. He acknowledged that when he first spoke to officers at the back sliding glass door, one officer said the police were there because “he believed that there was a burglary.” Two neighbors testified that they were awakened by P.B.P. running through their backyard screaming and calling for help as the police officers chased him. They testified that they had not heard any earlier disturbances that night. They described P.B.P.’s demeanor and appearance, including that he looked terrified and that his eyes were very red. The State called Officer Perrone as a rebuttal witness. He testified that on the night in question, P.B.P. appeared to be intoxicated. His speech was slurred, he had bloodshot eyes, he smelled of alcohol, and he was very belligerent in his tone.
At the close of all of the evidence, P.B.P. renewed his prior motions, and the trial court stood by its rulings. In closing argument, P.B.P. asserted that the officers entered his property without consent and without any reasonable basis. He contended that the officers trespassed on his property, that the State did not establish that the officers were engaged in the lawful execution of a legal duty, and that the State did not establish that exigent circumstances existed.
The trial court again concluded that the officers were engaged in the lawful performance of their duties and found that P.B.P. had committed the charged offenses. The court stated its findings as follows:
As has been established beyond a reasonable doubt by the evidence, we’re talking about approximately 3:00 in the morning and the report that they received, as the evidence indicated from an anonymous source, was that there were juveniles running through the backyards and so they responded. And in fact they began walking in the yard areas— the yard areas in the back as described to the Court without fences back there. They’re walking between yards and in fact now they come to a home and they’ve got their flashlights and they come to the home and their attention is attracted by a screen down on a home near a window. They proceeded at that point with Officer Bruce in the back of the home area with Officer Perrone in the front. Officer Perrone knocked on the door and that’s where he encountered for the first time the defendant in this case, who came to the door of what is his home and he was — and the Court will find that the officers had noticed something strange before that because as was testified they had seen someone peering out the window. They had seen someone, apparently through their observation, trying to hide under a counter in the home. All of this taken together with the screen and the report of juve *623 niles in the back as they have described caused them to have a very reasonable suspicion and to be cautious and to go about their lawful performance of duties. And they knocked on the door and someone came there and — and they spoke to them. And it was described that the parent was in Los Angeles but — and then finally it was described that he was in fact seventeen, a juvenile, and the officer asked for identification and the individual closed the door and said he’d go get the identification. Now, comes the encounter in the backyard and this is pivotal to the case. At that time there is another officer in the back. Now the defendant goes to the back. He opens and he encounters Officer Bruce. The Court is going to find and the evidence establishes beyond a reasonable doubt at that point there were some angry words at which time Officer Bruce is essentially asking the same question as the Officer at the front, “Give me some identification, we’ve got some strange circumstances.” And again there is some spirited discussion obviously with [P.B.P.], the defendant, ordering them off his property as they stood near the back door. It’s at that point that [P.B.P.] reached out with his right hand and struck the officer in this case, Officer Bruce — make sure we’re correct, and struck the officer in his left shoulder. Now, in this point in time the officer had identified himself as he testified, he was in full uniform. He was asking the defendant to identify himself when he refused to do so. In fact, he told the officer at that point if he’d go to the front with the other officers he’d get some ID, but again this spirited conversation and exchange as it’s described, but it culminated with [P.B.P.] putting hands on, striking against the will of the law enforcement officer who was in the lawful — engaged in lawful performance of his duty at the time.
The trial court then discussed the officers’ efforts to take P.B.P. into custody and ultimately found that P.B.P. had committed the charged offenses. After announcing its detailed findings, the court withheld adjudication and placed P.B.P. on probation.
On appeal, P.B.P. argues that the trial court should have dismissed the charges because the police officers were not engaged in the lawful execution of their duties and, therefore, had no lawful basis to enter his backyard. We disagree.
A reasonable expectation of privacy exists in the backyard of a residence that is not generally viewed by the public, but that expectation gives way in an emergency situation. State v. Duda, 437 So.2d 794, 795 (Fla. 2d DCA 1983). In Duda, the police responded to a radio bulletin concerning a domestic disturbance or a possible fight, and an officer went to the rear of the house because he heard shouting. The court noted that the existence of a potential emergency situation justified the officers’ presence in the backyard. Id. at 795-96. The court stated that the “determination of the existence of an emergency is to be measured by the reasonableness of [the officers’] belief at the time, not the existence of an emergency in fact.” Id. at 795. In Zeigler v. State, 402 So.2d 365, 371 (Fla.1981), the supreme court stated as follows:
The reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances. The right of police to enter and investigate an emergency, without an accompanying intent either to seize or arrest, is inherent in the very nature of their duties as peace officers and derives from the common law.
*624 In A.E.R. v. State, 464 So.2d 152 (Fla. 2d DCA 1985), the court considered whether, in response to a neighborhood trespassing complaint, police officers could lawfully enter the side yard of a home without a warrant. The officers first went to the front door in response to the complaint. They observed “juveniles jumping up and running toward the back door,” which the court stated gave “rise to the inference that the juveniles were eluding the officers and perhaps adding credence to the complaint.” Id. at 154. The court acknowledged that there is a “reasonable expectation from unreasonable governmental intrusion” that exists for that part of a backyard that is blocked from view from the front yard or the street. Id. at 153. However, based on exigent circumstances, the court concluded that the officers were justified in entering the side yard. Id. at 154.
In In re J.B., 621 So.2d 489 (Fla. 4th DCA 1993), an officer responded to a disconnected 911 call. Upon arriving at the home from which the call originated, he rang the doorbell. J.B. responded and indicated that he had no knowledge of anyone calling 911 and that he and friends were “messing around.” Id. at 490. The officer asked if J.B.’s mother was home, and J.B. said she was not. J.B. “then told the officer to get off of his property.” Id. The officer remained concerned because he had observed that a screen was off one of the front windows and that trash was all over the front room of the house. He tried to enter through the screen door, but it was locked. The officer asked J.B. to open the door, but J.B. refused, slammed the door shut, and locked it. The officer ran to the back of the house and saw J.B. pick up a stick. The officer then entered the sliding glass doors, and J.B. approached the officer with the stick. Eventually, J.B. was arrested and charged with resisting arrest and assault on a law enforcement officer. Id.
The court in J.B. rejected J.B.’s claim that the officer was not in the lawful execution of a legal duty because the officer attempted to break into the home when J.B. closed the door. The court noted that the police had the duty and obligation to investigate the 911 call and stated that under the circumstances, it “cannot second guess the officer’s concern” that someone might have needed aid or that, given the missing screen and the condition of the living room, a burglary may have just taken place. Id. at 490-91. The court concluded that “[t]he reasonableness of the officer’s response to an emergency situation is a question of fact for the trial court which we should not disturb absent a clear error.” Id. at 491.
The circumstances here compel a similar conclusion and support the trial court’s denial of P.B.P.’s motion to dismiss. At 3:00 a.m., the police officers responded to a disturbance call involving juveniles running through backyards. As the officers tried to determine whether juveniles were in the open backyard area, they saw suspicious circumstances at P.B.P.’s house, including an open window with the screen to the side, someone “peeping through” a window then trying to hide, and someone trying to hide under a counter. At this point, the officers were standing between two homes, and it is unclear whether they had actually entered P.B.P.’s yard.
Officer Perrone went to the front door while Officer Bruce remained in the rear area between P.B.P.’s house and a neighbor’s house. Although P.B.P. responded to the front door after a few minutes delay, he then went back into the house and to the rear door, where he called out to Officer Bruce using “colorful language.” The officers still did not know P.B.P.’s identity, whether he had been involved in the earli *625 er disturbance, or whether he was trespassing in or burglarizing the house. Officer Bruce approached P.B.P. at the rear only after P.B.P. called out. Neither Officer Bruce nor any of the officers tried to enter the house. Instead, when they tried to ascertain P.B.P.’s identity to determine whether he actually lived in the house, P.B.P. struck Officer Bruce. Under the totality of these circumstances, we conclude that the trial court did not err in determining that the officers were engaged in the lawful performance of their duties and in denying P.B.P.’s motion for judgment of dismissal.
The dissent argues that the officers did not have a legally sufficient basis, such as exigent circumstances, to enter or remain in the backyard areas, including P.B.P.’s backyard. However, as the court observed in Davis v. State, 834 So.2d 322, 327 (Fla. 5th DCA 2003),
[tjhere is no catalog of all of the exigencies that may allow a warrantless search of a residence primarily because “[t]he reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances.” Nevertheless, precedent provides us the necessary guidance and we derive therefrom that exigencies or emergencies related to the safety of persons or property may support a warrantless entry into a home. Hence, the police may enter a home to investigate a suspected burglary or to check on the safety of its residents, as those circumstances are generally considered exigent circumstances.
(Citations omitted.) The court added that “[a]n entry based on exigent circumstances must be limited in scope to its purpose” and that the police cannot continue a search once they determine that no exigency exists. Id.
The dissent also discusses several cases, the outcomes of which turn on the specific facts and circumstances of those cases. For example, in United States v. McClain, 444 F.3d 556 (6th Cir.2005), the issue involved entry into and a search of a house. The police responded to a phone call from a neighbor who reported seeing a light in a house that had been vacant. An officer saw that lights were on, and he performed a complete inspection of the outside of the house. The officer found no open or unlocked windows, gates, or doors, except he noted that the front door was slightly ajar. The officer entered the house even though there were no signs of forced entry, vandalism, or any kind of illegal activity. Id. at 559-60. In fact, both officers who responded to the call testified that there was no emergency that necessitated their entry into the home and that there were no signs of any criminal activity. Id. at 563.
The court concluded that the police were not justified in entering and searching the home, commenting that something more was required, “namely, the existence outside the searched premises of some physical signs of a burglary or some direct evidence of a home invasion.” Id. at 563. In discussing the basis for a warrantless entry into a residence without a warrant, the court stated that probable cause is required, “defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.” Id. at 562 (quoting United States v. Ferguson, 8 F.3d 385, 392 (6th Cir.1993)). In this context, “probable cause ‘requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.’ ” Id. at 563 (quoting Illinois v. Gates, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). While mere speculation that a crime could be occurring is not enough, if the police have an “ ‘objectively reasonable basis for their belief that a crime is being committed,” a warrantless search is justi *626 fied. Id. (quoting United States v. Ukomadu, 236 F.3d 333, 337 (6th Cir.2001)).
United States v. Brown, 449 F.3d 741 (6th Cir.2006), also involved entry into a residence. There, an officer responded to a call from a security service after a residential burglar alarm sounded repeatedly. The officer found that the front door to the residence was locked, but the exterior basement door was ajar approximately twelve inches. There was no car in the driveway, and the officer did not find any broken or pried-open doors. The officer entered the residence because he thought a burglary might be in progress. Id. at 746. However, the officer did not know if the defendant previously had problems with his security system or false alarms. Id. The court stated that under the totality of the circumstances, the officer had probable cause to believe a burglary was in progress, justifying the warrantless entry. Id. at 750. The court noted that “the scope of the intrusion must be circumscribed by the exigencies that justified the warrantless search.” Id. at 745.
Here, the totality of the circumstances supports the trial court’s determination that the officers were engaged in the lawful performance of their duties and the court’s denial of P.B.P.’s motion to dismiss. The officers were in an open backyard area investigating a disturbance call when they observed circumstances that justified their contact with P.B.P. at the front door and then at the rear door. Notably, this ease involves a limited entry into P.B.P.’s open backyard area and not an entry into or a search of the residence, a search of any fenced-in area of the property, or a search of P.B.P. The officers’ entry was appropriately limited based on the specific circumstances confronting them.
Finally, the dissent suggests that once the officers observed no one running through the backyards, they should have ended their investigation and left. We cannot agree. The officers responded to a disturbance call, and when they observed suspicious circumstances, they investigated using minimally intrusive means that were commensurate with the situation. The question of whether the officers were engaged in the lawful performance of their duties was for the trial court to determine as the trier of fact, based on the evidence. See Williams, 511 So.2d at 742. Because the trial court did not err in finding that the officers were engaged in the lawful performance of their duties and in denying P.B.P.’s motion for judgment of dismissal, we affirm.
Affirmed.
VILLANTI, J., Concurs.
KELLY, J., Concurs in part, dissents in part.

. The statutes under which P.B.P. was charged use slightly different terms. Section *620 784.07(2), Florida Statutes (2003), refers to the "lawful performance of his or her duties.” Sections 843.01 and 843.02, Florida Statutes (2003), refer to the “lawful execution of any legal duty.”