# Third District Court of Appeal

## State of Florida

Opinion filed October 14, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-369
Lower Tribunal No. 12-5932
_____

**The State of Florida,**
Appellant,

vs.

**Rafael Yee,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Milton Hirsch, Judge.

Pamela Jo Bondi, Attorney General, and Keri T. Joseph, Assistant Attorney General, for appellant.

Carlos J. Martinez, Public Defender, and Brian L. Ellison, Assistant Public Defender, for appellee.

Before WELLS, EMAS and SCALES, JJ.

SCALES, J.

The State of Florida appeals the trial court's order granting the motion of Rafael Yee, defendant below, to suppress all physical evidence discovered by the police officers conducting a warrantless search of the home Yee was renting. In light of the facts specific to this case, we reverse the trial court's suppression order because sufficient exigent circumstances justified the search.

## I.    <u>Facts</u>

On March 8, 2012, the police received a 7:00 a.m. phone call from a concerned neighbor reporting a "busted open" rear window in a house located in Miami (the "House"). The neighbor, who watched the House while its owners were out of town, informed the responding officer, Carl James, that the window was not broken the night before. Officer James called for a police canine, and a second officer, Stephanie Collazo, arrived on the scene with the requested canine.

At the hearing on Yee's motion to suppress, Officer James testified that nothing about the scene indicated imminent danger or emergency circumstances. He testified that he observed, however, that both the window and the window frame were pulled open and that there was broken glass on the ground on the inside and outside of the window. These observations, Officer James testified, gave him "the impression that someone had burglarized the house and that [the broken window] was the entry into the house."

Officer Collazo made similar observations, noticing a broken window, a pried off or damaged window-frame, and broken glass on the ground. Based on these circumstances, she testified that "[t]here is an assumption that there could possibly be someone inside" the House. Under this assumption, and with the police unable to locate either the owner or the occupant of the House, Officer Collazo and her canine climbed through the broken window, and she immediately announced her presence in the House.[1]

Receiving no response, Office Collazo released the police canine, which was trained to detect both human occupants and narcotics. At one point during Officer Collazo's clearing of rooms within the House, the canine sat in front of a closed, unlocked bathroom door, consistent with its training to sit in order to indicate the presence of narcotics. Officer Collazo opened the door to the bathroom and pulled back shower curtains, revealing the presence of cannabis plants. After ensuring no

---

[1] The dissent's erudite analysis is well-founded: the law of search and seizure protects the sanctity of the home. Exigent circumstances for the police to justify a warrantless entry into a home are narrow and limited. Florida jurisprudence recognizes, however, that an objective concern by the police for the welfare of the occupants of the home can create an exigent circumstance. See Davis v. State, 834 So. 2d 322, 327 (Fla. 5th DCA 2003). Given that the window-breaking occurred sometime overnight and the call to the police came at 7 a.m., it was reasonable for the police officers to be concerned – as Officer Collazo testified – about the safety of the occupants of the house, occupants who could not be contacted or found. That no movement or activity appeared to be occurring inside the house did not necessarily relieve the situation of portentousness. To an investigating police officer, silence and stillness can have meaning and a suspiciously broken window can give a view to the need for action.

one was present in the House, she exited, and notified the dispatcher that the House was clear of human occupants and was a possible "grow house."

Officer James and several other officers subsequently entered the House. A short while later, a detective arrived and, being informed of a possible "grow house," the detective prepared a search warrant, which was executed and resulted in the recovery of numerous cannabis plants.

During the officers' search of the House, Yee arrived at the scene, as he was renting the House from its owners. After receiving Miranda warnings, Yee indicated that he lived in the House and owned the cannabis plants. Consequently, Yee was arrested.

Yee was charged with one count of possession of cannabis pursuant to section 893.135, Florida Statutes (2014). Prior to trial, Yee's counsel moved to suppress the physical evidence of the cannabis as well as Yee's statements made to the police. Yee argued that the police did not have a sufficient exigency to enter the House without a warrant, and thus, that the initial entry into the House constituted an illegal search.

On February 5, 2014, after conducting an evidentiary hearing on Yee's motion, the trial court granted Yee's motion to suppress.[2] The State appealed.

## II. Standard of Review

---

[2] The trial judge did not reach the issue of Yee's testimonial evidence.

4

In a case involving an order granting a motion to suppress, the standard of review is mixed. While the trial court's factual findings come clothed with a presumption of correctness, we conduct a de novo review of "mixed questions of law and fact that ultimately determine constitutional issues." Riggs v. State, 918 So. 2d 274, 278 (Fla. 2005) (internal quotation marks omitted); see also Brown v. State, 152 So. 3d 619, 622 (Fla. 3d DCA 2014).

## III. Analysis

Both the Fourth Amendment to the U.S. Constitution and Article I, section 12 of the Florida Constitution guarantee the rights of Florida citizens to be secure in their homes against unreasonable searches and seizures. As a general rule, "[a] warrantless search of a home is per se unreasonable and thus unconstitutional." Seibert v. State, 923 So. 2d 460, 468 (Fla. 2006) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454–55 (1971)).

An exception for exigent circumstances exists, where "police may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for police assistance for the protection of life or substantial property interests." Seibert, 923 So. 2d at 468 (citing Rolling v. State, 695 So. 2d 278, 293–94 (Fla. 1997)).

Florida's seminal case on the subject of exigent circumstances in the context of a potential burglary is Guin v. City of Riviera Beach, 388 So. 2d 604 (Fla. 4th

DCA 1980). In Guin, a police officer, during a burglary investigation, checked a building with an open wooden latch and a door standing ajar. After calling his supervisor, he entered the building without a warrant, "in the belief that . . . [a] burglary had occurred or was taking place . . . ." Id. at 605. After a police inquiry of a neighbor led the officer to the nearby residence of the building's owner, the officer knocked on the door of the residence and received no response. As the officer approached another door, he saw an open window, a pushed-out screen, and a slightly ajar door, leading him to believe a burglary was in progress. The police again entered the premises without a warrant. In both of these instances of warrantless entry, the Fourth District held that "[t]he possibility that the burglary was in progress and the thief within the premises constituted sufficient exigent circumstances to excuse the requirement of a search warrant." Id. at 606.

Subsequent cases with similar factual situations have upheld warrantless police searches. Davis v. State, 834 So. 2d 322 (Fla. 5th DCA 2003); State v. Haines, 543 So. 2d 1278 (Fla. 5th DCA 1989); State v. Mann, 440 So. 2d 406 (Fla. 4th DCA 1983).

In Davis, a concerned citizen reported to the police that the front door of his neighbor's residence was open and that the neighbor's dog was wandering in the street, indicating a possible burglary. Davis, 834 So. 2d at 325. Police officers

6

found signs of forced entry and announced their presence without receiving a response. Suspecting a burglary, the officers entered the home without a warrant.

The court in Davis upheld the police officer's initial entry as a legal search; the court concluding that "the police may enter a home to investigate a suspected burglary" and "the circumstances presented a compelling need for immediate action." Id. at 327–28.

In Haines, a neighbor called the police to investigate a possible burglary because the owner of the residence was out of town, "the front door . . . was standing open approximately four to five inches[,] [i]t was 8:00 p.m.; and no lights were on inside." Haines, 543 So. 2d at 1279. After police officers arrived, they opened the door, announced themselves and, receiving no response, entered the residence.

The court in Haines reversed the trial court's suppression of incriminating evidence in the residence, concluding that the search was legal and that the police conducted the search for a possible burglar, not for contraband. Id.

In Mann, an officer noticed a bent-out window screen during an "undercover surveillance operation" at a resort complex that had experienced recent burglaries. Mann, 440 So. 2d at 407. Upon closer inspection, the officer observed that the front door's lock had been tampered with and the door itself was unlocked. Id.

The court in <u>Mann</u> reversed the trial court's determination that there was not probable cause for the police to enter the house, holding that the officer's need to investigate the possible burglary was sufficient and "the officer's immediate entry without a warrant was justified under the exigent circumstances exception. . . ." <u>Id.</u> at 408 (citing <u>United States v. Estese</u>, 479 F.2d 1273 (6th Cir. 1973)).

The facts in the instant case mirror the facts in the cases cited above: in each instance, physical indications of forced entry into a residence led a police officer to a reasonable belief that a burglary either was in progress or had recently occurred.

In the instant case, the neighbor noted that the House's window was not shattered the night before when the neighbor inspected the house. At the scene, the police officers witnessed broken glass on both the inside and outside of the rear window, as well as a damaged window frame. Although Officer James testified at the suppression hearing that the scene did not indicate an emergency situation, he had an impression that there had been a recent burglary. Officer Collazo assumed that there was an ongoing burglary, or one had very recently occurred, and she surmised that someone could be inside the House.[3] The police called the owner of

_____

[3] <u>See</u> <u>State v. Boyd</u>, 615 So. 2d 786, 789 (Fla. 2d DCA 1993) ("An emergency need not, in fact, exist so long as the officer reasonably believes it to exist because of objectively reasonable facts. The officer's conclusion then may be based on a combination of the 'objective' nature of the circumstances and the officer's 'subjective' perception of those circumstances."). Accordingly, Officer Collazo's observations of the scene and the subjective beliefs she derived from those observations qualify her actions under the exigency rule.

the House, received no answer, and were otherwise unable to locate the owner or occupant. The officers' clear intent in entering the House was not to seize contraband, but to investigate a burglary.[4]

We appraise the actions of the police for reasonableness. See Brigham City, Utah v. Stuart, 547 U.S. 398, 398 (2006) ("Because the Fourth Amendment's ultimate touchstone is 'reasonableness,' the warrant requirement is subject to certain exceptions."). The police officers' warrantless entry into the House was reasonable, given the exigency of an apparent burglary.

Based on our de novo review of the facts as found by the trial court, we conclude that sufficient exigent circumstances existed to justify the warrantless entry into the House.[5] The trial court should have denied Yee's motion to suppress.

## IV.  Conclusion

---

[4] Officer James requested a police canine be brought to the House to check for occupants or intruders; nothing in the record suggests that Officer Collazo and her canine were called to search for contraband or were called for any other reason.

[5] Having determined that sufficient exigent circumstances justified Officer Collazo's warrantless entry into the House, we similarly conclude that Officer Collazo's opening of the closed bathroom door did not constitute an illegal search. See State v. Riggs, 890 So. 2d 465 (Fla. 4th DCA 2004) (holding there were exigent circumstances justifying a warrantless search where police opened a closed door and discovered cannabis plants during the police's investigation of a potential burglary). Her search of the bathroom was within the circumscribed boundaries of the justified warrantless search. See Seibert, 923 So. 2d at 468 (citing Mincey v. Arizona, 437 U.S. 385, 393 (1978)).

Because we conclude that the trial judge erred in granting Yee's motion to suppress, we reverse the trial court's order and remand for further proceedings.

Reversed and remanded for proceedings consistent herewith.

WELLS, J., concurs.

EMAS, J., dissenting.

## INTRODUCTION

Here is the question presented in this case:

Does the Fourth Amendment permit police officers to enter and search a home without a warrant, when the officers have reason to believe that a burglary may have occurred within the past eight to twelve hours, but have no reason to believe that the burglary is in progress, have no reason to believe that anyone is presently inside the home, and have no reason to believe there is any imminent threat to persons or property within the home?

A warrantless entry and search of the home is presumptively unreasonable under the Fourth Amendment to the United States Constitution and under Article I, section 12 of the Florida Constitution. To justify a warrantless entry and search of the home, the State has the burden of establishing that:

- Exigent circumstances existed;
- Immediate action was necessary to address the exigency; and
- There was no time to secure a warrant before taking immediate action and entering and searching the home to address the exigency.

Quite simply, the result in this case is compelled by a failure of proof. Because the State failed to meet its burden of establishing the existence of exigent circumstances, the need for immediate entry, and the lack of time to secure a warrant, the presumption of unreasonableness remains undisturbed, and therefore

11

the warrantless entry and search of the home violated the Fourth Amendment and Article I, section 12 of the Florida Constitution. I would affirm the trial court's order suppressing the evidence.

**FACTS**

The following factual circumstances, as found by the trial court and supported by the record, are relevant in determining whether the State met its requisite burden of establishing exigent circumstances to overcome the presumptively unreasonable warrantless entry and search of the home:

● A neighbor called police just before 7 a.m. to report that a rear window was broken at his neighbor's home. The call was made to a non-emergency police phone number and was not a 911 call.

● Police were dispatched to the home in non-emergency mode. The dispatch was not sent out as a "burglary in progress" and the responding officer did not engage his emergency lights or sirens when responding to the home.

● Upon arriving at the home, the officer spoke with the reporting neighbor, who told the officer that upon returning from work the previous evening, the window was not broken, but that when he woke up in the morning, he saw the broken window.[6]

_____

[6] The neighbor did not give police any more precise a timeframe. We therefore do not know exactly how many hours passed between his return from work the prior evening (when he observed the window was not broken) and 7 a.m. the next morning (when he observed the broken window and called police). The neighbor did not testify at the suppression hearing. However, I assume, for this discussion, that the timeframe is eight to twelve hours (i.e., that the neighbor returned home from work sometime between 7 p.m. and 11 p.m. the previous evening).

12

● The neighbor did not observe any criminal activity, did not observe anybody coming in or out of the window, and did not observe anyone taking anything from the home.

● The officer went to the back of the home to view the window, and did not see or hear anything to indicate the presence of a person in the home or any imminent danger. The officer observed broken glass on the ground outside the home and on the floor inside the home.

● The officer also saw that the window was surrounded by a metal frame and that a portion of that frame appeared to have been pried open or pried away from the window at some point in time. Significantly, however, no evidence was presented as to when or how this had occurred. The neighbor did not tell the dispatcher or advise the officer on the scene that the frame had been pried open or was different in appearance from the evening before, reporting only that the window had been broken. The officer did not testify that he asked the neighbor about the condition of the frame.

● The officer testified that based upon his observations, it appeared that a burglary had taken place. However, no evidence was presented that the burglary was in progress, that anyone was in the home, or that there was any emergency.

● By the time the police prepared to enter the home (through the window) there were a total of five or six officers at the scene.

● However, no police officer entered the home at that time. Instead, the officers contacted dispatch to request a K-9 unit respond to the home.

● Some amount of time passed before the K-9 unit arrived at the home. It is unclear from the record just how much time passed between the call requesting a K-9 unit and the eventual arrival of the K-9 unit.

● Once the K-9 officer arrived at the home, she did not immediately enter the home. Instead, the K-9 officer verified a perimeter was set up around the property and that there was a visual break in the home. Thereafter, the K-9 officer went back to her vehicle, suited up the dog and herself and gave two or three verbal warnings through the window, in three different languages. After hearing no response, the K-9 officer finally entered the home. It is not clear from the record just how much time passed between the arrival of the K-9 unit and the entry of the K-9 officer (together with the K-9) into the home.

● There was no evidence that the K-9 officer, or any of the other officers on the scene, observed anyone inside the home, saw any movement within the home, or heard any sounds coming from within the home.

● The State presented no evidence at the hearing as to why the police could not obtain a warrant before entering the home. The State presented no evidence regarding the total amount of time that elapsed between the initial officer's arrival on the scene and the entry of the K-9 unit into the home.

● The State presented no evidence upon which to base a belief that anyone was in the home; that anyone in the home was in danger or in need of immediate assistance; or that there was any immediate threat to property within the home.

The trial court determined that the State failed to establish a reasonable basis to believe a burglary was in progress or had even occurred, and that the State further failed to establish the existence of exigent circumstances to justify a warrantless entry into and search of the home. The trial court granted the motion and suppressed the evidence seized inside the home. The trial court was correct.

**ANALYSIS**

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, section 12 of the Florida Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.

The sanctity of the home, and the privacy interests represented by that sanctuary, stands as one of the most important rights protected by the United States Constitution. Its legal and historical significance cannot be overstated.

**1. The Special Protection and Scrutiny Accorded Warrantless Searches of the Home**

The United States Supreme Court, in construing the Fourth Amendment and delineating its requirements, have imposed greater scrutiny upon, and afforded heightened protection to, searches and seizures that involve an intrusion into the home. In <u>Payton v. New York</u>, 445 U.S. 573 (1980), the Court observed:

15

"A greater burden is placed ... on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment."

Id. at 587 (quoting with approval Dorman v. U.S., 435 F.2d 385, 389 (D.C. Cir. 1970)).

The Payton Court expressly approved the Dorman analysis and further explained:

[The] analysis [in Dorman]. . . focused on the long-settled premise that, absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within. [The opinion] reasoned that the constitutional protection afforded to the individual's interest in the privacy of his own home is equally applicable to a warrantless entry for the purpose of arresting a resident of the house; for it is inherent in such an entry that a search for the suspect may be required before he can be apprehended. [Dorman] concluded that an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection.

This reasoning has been followed in other Circuits. Thus, the Second Circuit recently summarized its position:

"To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." United States v. Reed, 572 F.2d 412, 423 (1978), cert. denied, sub nom. Goldsmith v. United States, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259.

We find this reasoning to be persuasive and in accord with this Court's Fourth Amendment decisions.

Payton, 445 U.S. at 587-89.

16

The <u>Payton</u> Court concluded that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." <u>Id.</u> at 590.

The sanctity of the home against warrantless searches stands not only as a foundational concept in Fourth Amendment jurisprudence, but finds its roots in English jurisprudence as well. In <u>Boyd v. United States</u>, 116 U.S. 616 (1886), the Supreme Court offered a historical perspective on the origins of the Fourth Amendment and the scope of its protection:

> In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or then recent history of the controversies on the subject, both in this country and in England. The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book;' since they placed 'the liberty of every man in the hands of every petty officer.' This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country.
>
> 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.'
>
> <u>Id.</u> at 624-25.

<u>Boyd</u> then recalled Lord Camden's historic decision in <u>Entick v. Carrington</u>, 19 How. St. Tr. 1029 (C.P. 1765) which outlawed the use of

general warrants. The decision of Lord Camden is described by the Boyd

Court as "a monument of English freedom," and was hailed "by the lovers of

liberty in the colonies as well as in the mother country." Boyd, 116 U.S. at

626. The Court further observed:

> As every American statesman, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the fourth amendment to the constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures.
>
> . . .
>
> The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense,-it is the invasion of this sacred right which underlies and constitutes the essence of Lord CAMDEN's judgment.

Id. at 626-27, 630.

Four score and one year later, in Warden v. Hayden, 387 U.S. 294, 301

(1967), the Court reaffirmed the historical underpinnings of the Fourth

Amendment and the constitutional boundary represented by the threshold of one's

home:

We have examined on many occasions the history and purposes of the Amendment. It was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions of 'the sanctity of a man's home and the privacies of life,' Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, from searches under indiscriminate, general authority. Protection of these interests was assured by prohibiting all 'unreasonable' searches and seizures, and by requiring the use of warrants, which particularly describe 'the place to be searched, and the persons or things to be seized,' thereby interposing 'a magistrate between the citizen and the police,' McDonald v. United States, *supra*, 335 U.S., at 455, 69 S.Ct., at 193.

The [use of general warrants] has been recognized from early days in Anglo-American law. Search warrants, for seizure of stolen property, though having an ancient lineage, were criticized even by Coke. Institutes Bk. 4, pp. 176—177.

Id. at 301.

The Supreme Court, on several occasions over the past two decades, has

reaffirmed this basic tenet:

Principled respect for the sanctity of the home has long animated this Court's Fourth Amendment jurisprudence. See, e.g., Wilson v. Layne, 526 U.S. 603, 610, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home"); Payton v. New York, 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (emphasizing "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic"); Mincey v. Arizona, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ("[T]he Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law").

Illinois v. McArthur, 531 U.S. 326, 340 n.3 (2001).

Because "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion' " stands " '[a]t the very core' of the Fourth Amendment," Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)), our cases have firmly established the " 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (footnote omitted). Thus, "absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." Id., at 587–588, 100 S.Ct. 1371 (footnote omitted). See Kyllo, 533 U.S., at 29, 121 S.Ct. 2038; Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); Chimel v. California, 395 U.S. 752, 761–763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); McDonald, 335 U.S., at 454, 69 S.Ct. 191; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

Groh v. Ramirez, 540 U.S. 551, 559 (2004).

As to the basic right in question, privacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as understood since the beginnings of the Republic. This common understanding ensures respect for the law and allegiance to our institutions, and it is an instrument for transmitting our Constitution to later generations undiminished in meaning and force. It bears repeating that it is a serious matter if law enforcement officers violate the sanctity of the home by ignoring the requisites of lawful entry. Security must not be subject to erosion by indifference or contempt.

Hudson v. Michigan, 547 U.S. 586, 603 (2006).

## 2. The Presumption of Unreasonableness and the Burden of Proof

It is with this well-entrenched backdrop in mind that we examine the warrantless entry into, and search of, the home in the instant case. Importantly, we must bear in mind the presumption and burden of proof applicable to this warrantless entry and search of the home, as it largely dictates the outcome of the analysis. In Riggs v. State, 918 So.2d 274 (Fla. 2005), the Florida Supreme Court explained the presumption, the burden, and the requisite proof to justify a warrantless entry and search of the home:

> When the government invokes this exception to support the warrantless entry of a home, it must rebut the presumption that such entries are unreasonable. See Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). To do so, it must demonstrate a "*grave emergency*" that "makes a warrantless search *imperative to the safety of the police and of the community*." Illinois v. Rodriguez, 497 U.S. 177, 191, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). An entry is considered "imperative" when the government can show a "compelling need for official action *and no time to secure a warrant*." Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). As is often the case under the Fourth Amendment, "[t]he reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances." Zeigler v. State, 402 So.2d 365, 371 (Fla.1981).

Riggs, 918 So. 2d at 278-79 (emphasis added.)

As the Florida Supreme Court held in Rolling v. State, 695 So. 2d 278, 293 (Fla.1997), "a key ingredient of the exigency requirement is that the police lack time to secure a search warrant." (Emphasis added.)

### 3. The "Carefully Defined Classes of Cases"

The United States Supreme Court has held that under the Fourth Amendment

21

> one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.

Michigan v. Tyler, 436 U.S. 499, 506 (1978) (quoting Camara v. Municipal Court, 387 U.S. 523, 528-29(1966)). These carefully defined classes of cases include hot pursuit of a fleeing suspect (Warden, 387 U.S. at 294); the need to prevent imminent destruction of evidence (Ker v. California, 374 U.S. 23 (1963)); emergency administrative inspection of commercial premises (Camara, 387 U.S. at 528-29); to fight a fire (Tyler, 436 U.S. at 499); upon observing an ongoing brawl taking place inside the home, to render emergency assistance to an injured occupant or to protect other occupants from imminent injury (Stuart, 547 U.S. at 398).

This list demonstrates that the exigent circumstances exception to the search warrant requirement is narrow and limited, and it self-evidently follows that the present circumstances simply cannot be said to fall within this narrow class of cases.

The State posits that the officers had a difficult task before them, and a difficult decision to make. This may well be. And a bright-line rule permitting a warrantless entry for nothing more than a "recent" burglary (as the majority's opinion would necessarily imply) would surely simplify the task and the decision-

making process for law enforcement.  But as the United States Supreme Court has

recognized:

> [T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment.  The investigation of crime would always be simplified if warrants were unnecessary.  But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.

Mincey v. Arizona, 437 U.S. 385, 393 (1978) (internal citations omitted).

## 4.  The Failure to Prove the Existence of an Exigency

Even if there was probable cause to believe a burglary had occurred

sometime in the recent past,[7] there was no showing of exigent circumstances to

---

[7] The trial court determined that the State failed to establish a reasonable basis to believe a burglary had occurred at all.  This was based in part on the conclusion that the only relevant evidence the State offered was that a window had been broken sometime in the previous twelve hours.  Although the police officer did testify that the window frame appeared to have been pulled open, there was no testimony as to when or how this occurred.  Even though the neighbor was on the scene when the officer made this observation, the officer apparently did not ask (and the neighbor apparently did not indicate) whether the condition or appearance of the window frame was different from the night before.  The trial court thus discounted this testimony, given the absence of any evidence or testimony as to when or how the frame came to be in this condition.  We could affirm on this basis alone, as the analysis is not dependent upon the subjective belief of the officer, but rather on the objective reasonableness of that belief.  Brigham City, 547 U.S. at 404; Mincey, 437 U.S. at 393-94.  Nevertheless, even if this observation should properly have been considered, there was at most a basis to believe a burglary had occurred in the past eight to twelve hours.  In the absence of any reasonable basis to believe a burglary was ongoing, and in the absence of any other exigent circumstance, the warrantless entry and search of the home remained

23

justify the warrantless entry into the home. As the Florida Supreme Court held, in order to establish exigent circumstances, the State must prove that "an objectively reasonable basis exists for the officer to believe that there is an <u>immediate need</u> for police assistance for the protection of life or substantial property interests." <u>Seibert v. State</u>, 923 So. 2d 460, 468 (citing <u>Rolling</u>, 695 So. 2d at 293-94) (emphasis added). In <u>Riggs</u>, 918 So.2d at 278-79, the Florida Supreme Court explained the State "must demonstrate a grave emergency that makes a warrantless search imperative to the safety of the police and of the community. An entry is considered imperative when the government can show a compelling need for official action and no time to secure a warrant." (Internal quotes and citations omitted.) The concept of exigent circumstances is necessarily premised on the fact that the circumstances are so urgent and the potential consequences so grave, that "immediate action" by the police is required. <u>Hornblower v. State</u>, 351 So. 2d 716, 718 (Fla. 1977); <u>Potts v. Johnson</u>, 654 So. 2d 596, 600 (Fla. 3d DCA 1995); <u>Williams v. State</u>, 403 So. 2d 430, 433 (Fla. 3d DCA 1981); <u>P.B.P. v. State,</u> 955 So. 2d 618, 629 (Fla. 2d DCA 2007).

Any claim of a grave emergency requiring immediate action in this case is either unsupported by the evidence, or is affirmatively rebutted by the evidence presented at the hearing, including the following:

---

presumptively unreasonable under the Fourth Amendment.

24

- The call made by neighbor was not a 911 call.

- The neighbor did not state that the burglary was ongoing or in progress. In fact, the only evidence was that the neighbor's window had been broken sometime between the prior evening and 7 a.m. the next morning.

- The police responded in non-emergency mode, without emergency lights or sirens.

- The responding officers met with the neighbor and spoke at length. After observing the home and the window, the officer did not enter the home.

- The officers heard no noise within the home and saw no movement or other activity in the home. There was no indication that anyone was in the home, no indication of any imminent danger to anyone in the home (or to the officers standing outside the home) and no indication that any person or property was exposed to imminent damage or destruction.

- Instead of entering the home, the police called for a K-9 unit to come to the home to conduct a search.

- There is no evidence K-9 responded in emergency mode.

- There is no evidence as to how long it took to secure a K-9 unit and for the K-9 unit to arrive at the home.

- Upon arrival, the K-9 officer did not immediately enter the premises, but suited up herself and her K-9, spoke with officers on the scene, obtained background information, inspected the perimeter of the home, gave a warning of impending entry, and waited several minutes for a response before entering.

- The K-9 officer heard no sound within the home and saw no movement or other activity in the home. There was no evidence that anyone was in

the home, let alone that anyone was in the home and either injured or threatened with imminent injury.

At best, the police had cause to believe that, at some time during the previous eight to twelve hours, someone may have entered the home through the broken window. That is the sum and substance of what an objectively reasonable officer could believe. There were no articulable facts upon which to base a belief that a burglary suspect (or anyone else) was inside the home. There was no basis to suggest, much less to establish, the existence of any exigent circumstances to permit a warrantless entry. How could the State demonstrate that there were exigent circumstances demanding the responding officer take "immediate action," when the officer's "immediate action" (after speaking with the neighbor) was not entering into the home, but calling for a K-9 unit to come and conduct the entry and search?[8]

And how could the State demonstrate that there were exigent circumstances when the K-9 officer arrived, where the K-9 officer's "immediate action" upon arrival was not entering the home? Instead the K-9 officer took the time to speak

---

[8] The State presented evidence that departmental policy requires the use of a K-9 to enter the home of a suspected burglary for officer safety. Officer safety is a compelling concern and a valid reason for implementing such a policy. However, departmental policy cannot supplant constitutional jurisprudence or serve as a substitute for exigent circumstances. The fact that the police believed the circumstances facing them did not require immediate action, and that there was sufficient time to call for and await the arrival of a K-9 unit, objectively undercuts the assertion that exigent circumstances existed.

to officers on the scene, inspect the home and perimeter, peer through the window to survey the interior of the home, call out in English, Spanish and Creole (to announce her intent to enter with a dog) and thereafter waited several minutes for a response or some movement indicating the presence of someone inside the home.

Only after all of this was accomplished did she enter the home with her dog. I do not suggest that these investigatory actions were unreasonable. To the contrary, I believe that the preliminary actions and conduct of the police officers were reasonable, but only up to the point of entering the home without a warrant. The totality of the circumstances, together with the actions and conduct of the police officers do not establish exigent circumstances; rather, they affirmatively demonstrate there were no exigent circumstances to justify entering the home without a warrant.

This case may well boil down to the difference between a suspected burglary occurring at some imprecise time in the recent past (e.g., between last evening and 7 a.m. in the morning), and a suspected burglary *in progress*. I do not quarrel with the implicit premise of the majority's opinion that a suspected burglary *in progress* generally presents an exigent circumstance justifying a warrantless entry into the home. Obviously, if the facts warrant a reasonable person to believe that a suspect is inside another person's home, committing a burglary, this would generally

present an exigent circumstance, requiring immediate action and vitiating the requirement of (and ability to obtain) a warrant before entering the home.

It is this very distinction that exposes the shortcoming of the majority opinion. In the instant case, the facts as determined by the factfinder below do <u>not</u> establish probable cause to believe a burglary was in progress. This case involves, at most, a suspected burglary that occurred at some time in the past eight to twelve hours. The evidence as presented (and the facts as determined by the trial court) established that the officers had no objectively articulable or reasonable basis to believe that a burglary was ongoing, no articulable or reasonable basis to believe that anyone was inside the home, and no articulable or reasonable basis to believe persons were injured or in imminent danger of injury, or that property was in imminent danger of destruction. Given the evidence presented, and the findings of the trial court, it is clear that the State failed to establish (and the majority fails to adequately explain) what exigency existed to justify the officer's warrantless entry into and search of the home.

### 5. The Failure to Prove an Inability to Secure a Warrant

The State failed not only to demonstrate the existence of an exigency, but failed to offer any evidence that the imperative nature of the claimed exigency prevented the police from seeking or securing a warrant before entering the home. As the Florida Supreme Court noted, "a key ingredient of the exigency requirement

is that the police lack time to secure a search warrant." <u>Rolling</u>, 695 So. 2d at 293; <u>Hornblower</u>, 351 So. 2d at 718 (holding that "if time to get a warrant exists, the enforcement agency must use that time to obtain the warrant.")

The burden was upon the State to establish that there was insufficient time to obtain a warrant, and the State offered no proof in this regard. If police had enough time to speak with the neighbor, inspect the window, conduct a perimeter check, and call for a K-9 unit, why didn't the police have enough time to secure a warrant? The record fails to establish how much time elapsed from the time the initial officer arrived at the home and the time he called for a K-9 unit.

Even after the K-9 unit arrived on the scene, immediate action was not taken. As described earlier, before entering the home the K-9 officer first: verified that there was a perimeter set up around the property and that there was a visual break in the home; went back to her vehicle, suited up the dog and herself; gave two or three verbal warnings through the window, in three different languages; and waited several minutes for a response. If the K-9 officer had enough time to take these actions, why didn't the police have enough time to secure a warrant? The record fails to establish how much time elapsed between the arrival of the K-9 unit and the entry of the K-9 officer (together with the K-9) into the home. The above circumstances undercut any reasonable assertion that a grave emergency existed,

29

that immediate action was required, and that there was insufficient time to secure a warrant.[9]

I agree that exigent circumstances may justify a warrantless entry and search of a home where there is an objectively reasonable basis to believe there is a burglary in progress. However, I find no principled basis to extend the narrow concept of exigent circumstances to a "recent" burglary[10] that may have occurred

---

[9] It was only after entering the home, clearing the home by searching each of the rooms, and finding marijuana plants inside, that the police finally decided to secure a search warrant. The State presented no evidence regarding the length of time it took to secure this post-entry, post-search warrant or why the police could not have done the same prior to entering and searching the home.

[10] Those cases holding that a "recent burglary" may qualify as exigent circumstances appear to base the decision on the concept of a "community caretaker" doctrine. See Cady v. Dombrowski, 413 U.S. 433 (1973). In announcing the community caretaker doctrine as an exception to the warrant requirement, the United States Supreme Court limited this exception to automobile searches. Id. at 439, 447-48 (acknowledging the "constitutional difference" between searches of a home and searches of an automobile, and holding that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office"). The United States Supreme Court has never squarely held that the community caretaker doctrine is applicable to warrantless searches of a home. Ray v. Township of Warren, 626 F.3d 170 (3d Cir. 2010); United States v. Bute, 43 F.3d 531 (10th Cir. 1994); United States v. Erickson, 991 F.2d 529 (9th Cir. 1993); United States v. Pichany, 687 F.2d 204 (7th Cir. 1982). Nevertheless, it appears the United Supreme Court has at least recognized that "emergency situations" may justify warrantless entries by officers acting in their capacity as a community caretaker (rather than in their traditional role of investigating criminal activity and apprehending suspects). In Mincey, 437 U.S. at 392, the Court observed:

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a

30

eight to twelve hours earlier, without evidence of an exigency, a need for immediate action, and a lack of time to secure a warrant.

**CONCLUSION**

The trial court considered the totality of the circumstances, made findings of fact supported by the record, and properly concluded in a thorough order that there were no exigent circumstances to justify the warrantless entry into, and search of, the home. I would affirm the trial court's order granting the motion to suppress.

For these reasons I respectfully dissent.

---

person within is in need of immediate aid. (Footnotes omitted.)

The Florida Supreme Court has also recognized an "emergency medical aid" exception that is akin to the concept of a police officer acting as a community caretaker in this regard. See Riggs, 918 So. 2d at 279. See also Ortiz v. State, 24 So. 3d 596 (Fla. 5th DCA 2009) (en banc). However, even if some form of the community caretaker doctrine is applicable to warrantless entries and searches of a home, the mere fact that the officer is acting as a community caretaker cannot by itself justify a warrantless entry into the home. There must still be an objectively reasonable belief that there exists an exigency—some *imminent* danger to a person— requiring the officer to take immediate action in her role as a community caretaker. No such exigency exists in the instant case.